UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JONATHAN MANNION,

                Plaintiff,

        -against-                                 04 Civ. 1187 (LAK)

COORS BREWING COMPANY, et ano.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

        Mary D. Dorman
        *Attorney for Plaintiff*

        George H. Hirsch
        Kirstein McGaw Grossman
        BRESSLER, AMERY & ROSS, PC
        *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

        Plaintiff moves for reconsideration of this Court's order[1] granting defendants' motion *in limine* to exclude the testimony and opinions of plaintiff's experts, but only insofar as that order excluded the testimony of Dr. Larry Chiagouris and Raymond Meier. In the alternative, plaintiff seeks an order (a) finding that plaintiff's offer of evidence of defendant Coors Brewing Company's

---

[1] DI 85.

gross receipts from the sale of Coors Light Beer in the United States in 2002 will meet plaintiff's burden of proof of damages under 17 U.S.C. § 501, (b) taking judicial notice of certain facts, and (c) permitting plaintiff to publish to the jury hard copies of certain photographs, in addition to exhibiting them electronically, after they are received in evidence. The motion is supported by an affidavit, exhibits and a 22-page memorandum of law.

A.   *The Motion for Reconsideration*

As an initial matter, the motion for reconsideration fails to comply with the rules of this Court. S.D.N.Y. CIV. R. 6.3 precludes the submission, absent leave of court, of affidavits in support of motions for reconsideration. It does so for a perfectly sensible reason. A motion for reconsideration is designed to bring to the Court's attention evidence and authorities that were before the Court on the original motion but overlooked by it.[2] It is not an occasion for making arguments and offering evidence that could have been, but was not, adduced on the original motion.[3] Accordingly, to the extent that the affidavit and exhibits are offered in support of reconsideration of the previous order, the Court declines to consider them.

1.   *Mr. Meier*

Insofar as plaintiff seeks reconsideration of so much of the order as excluded Mr. Meier as a witness, his memorandum argues only that his testimony would be relevant on the issue

---

[2] *See, e.g., In re Rezulin Prods. Liab. Litig.,* 224 F.R.D. 346, 349 (S.D.N.Y. 2004); *Range Road Music, Inc. v. Music Sales Corp.,* 90 F. Supp.2d 390, 392 (S.D.N.Y. 2000).

[3] *See, e.g., Pfizer, Inc. v. Stryker Corp.,* No. 02 Civ.8613 (LAK), 2005 WL 44383, at *1 (S.D.N.Y. Jan. 10, 2005); *Rezulin,* 224 F.R.D. at 349.

of wilfulness. He does not even address the basis for the Court's ruling, viz. that Mr. Meier's testimony would not be helpful to the trier of fact. He therefore has failed to demonstrate that the Court overlooked anything in excluding this testimony.

   2.   *Dr. Chiagouris*

Finally, plaintiff seeks reconsideration of so much of the order as excluded Dr. Chiagouris' testimony. He maintains that the Court erred in concluding that Dr. Chiagouris is not qualified to offer the opinions that plaintiff would adduce from him. He argues also that the Court's ruling impermissibly shifts to plaintiff the burden to show what revenue received by defendant Coors was received from sources other than the allegedly infringing billboard. Ostensibly in support of the latter argument, he maintains that defendants admitted that there were 250 billboards and that any lack of data supporting Dr. Chiagouris' opinions is attributable to defendants' refusal to provide discovery. The Court begins with the contention that the exclusion of Dr. Chiagouris' testimony impermissibly shifts the burden to the plaintiff, which is the only new point raised by plaintiff.

   a.   *Alleged Shifting of Burden of Proof*

Section 504(b) of the Copyright Act of 1976[4] provides that a successful copyright infringement plaintiff is entitled to recover actual damages "and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." It goes on to say that "[i]n establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her

---

[4] 17 U.S.C. § 504(b).

deductible expenses and the elements of profit attributable to factors other than the copyrighted work." Thus, a plaintiff seeking to recover an infringer's profits generally makes out a *prima facie* case by proof "of the infringer's gross revenue." It is up to the infringer to demonstrate that all or part of that gross revenue consists of "deductible expenses and . . . elements of profit attributable to factors other than the copyrighted work."

The applicability of this principle where, as here, the alleged infringement includes the use of a copyrighted work in an advertisement for another product presents a more subtle question. In *On Davis v. The Gap, Inc.*,[5] the plaintiff held a copyright in a form of sculptured ornamental eye jewelry that the defendant, which had several lines of business, depicted in print advertisements for Gap label stores. The Court of Appeals for our Circuit held that the plaintiff "failed to discharge his burden by submitting [the defendant's] gross revenue . . . derived in part from sales under other labels within [its] corporate family that were in no way promoted by the advertisement, not to mention sales under the 'Gap' label of jeans, khakis, shirts, underwear" and other products.[6] Although it recognized that the literal terms of Section 504(b) might suggest that proof of the corporate gross revenues would be sufficient, it observed that "the term 'gross revenue' under the statute means gross revenue reasonably related to the infringement, not unrelated revenues."[7] In other words, "the statutory term 'infringer's gross revenue' should not be construed so broadly as to include revenue from lines of business that were unrelated to the act of

---

[5] 246 F.3d 152 (2d Cir. 2001).

[6] *Id.* at 161.

[7] *Id.* at 160.

infringement."[8]

*Davis* leaves unanswered the question whether proof of an advertiser-infringer's gross profits for the line of business promoted by an advertisement would suffice under Section 504(b) as proof of the infringer's gross revenue where, as here, the advertisement infringes plaintiff's copyright by reproducing within it the plaintiff's copyrighted work or whether additional proof of a causal connection between the infringement and the defendant's revenues is necessary.[9] Dr. Chiagouris' proposed testimony presumably is either addressed to the possibility that such evidence will prove necessary or, perhaps, be intended simply to anticipate an argument by Coors that its Coors Light gross revenues were not attributable to the infringement. In either case, however, the Court's exclusion of Dr. Chiagouris' testimony does not affect the plaintiff's burden. It is what it is. Plaintiff's contrary contention is mistaken.

*b. The Opinions*

Passing to the admissibility of the testimony, it is well to begin with a summary of the proposed testimony.

According to his report, Dr. Chiagouris, if permitted on the stand, would testify that, in his opinion, the use of the allegedly infringing image on the Iced Out billboards resulted in actual profits to Coors in 2002 of between \$6.1 and \$36.5 million in profits, probably closer to the latter

---

8 *Id.*

9 *Fournier v. Erickson,* 242 F. Supp.2d 318, 327-28 (S.D.N.Y. 2003), and *Shady Records, Inc. v. Source Enters., Inc.,* No. 03 Civ. 9944(GEL), 2005 WL 14920, at * 22-23 (S.D.N.Y. Jan. 3, 2005), suggest that proof of the advertiser-infringer's gross revenues for the relevant line of business would suffice.

figure.[10] His report indicates that he came to this conclusion by the following chain of reasoning:

- Coors used the billboards containing the image in at least 250 locations.[11]

- It is reasonable, in Dr. Chiagouris' opinion, to conclude that these billboards "were effective," a conclusion based upon the facts that (a) 250 were ordered, (b) they were made available to Coors distributors for most of 2002, which is said to be suggestive of a level of satisfaction with them, (c) no complaints concerning the billboards were produced by defendants, (d) defendant Carol H. Williams Advertising ("CHWA") "has a reputation for creating effective advertising," a conclusion derived from puffing by CHWA on its own web site and steady growth, as reported by *Black Enterprise* magazine, of the CHWA agency,[12] and (e) Coors' "reputation for conducting effective advertising."[13]

- Dr. Chiagouris then assumes that the billboards were in use for 12 months although (1) he acknowledges that "[t]here is no standard amount of time that billboards stay up in view of the public," and (2) the only data he cites in support of that assumption is statements of plaintiff's counsel that shipments of the billboard occurred as early as April 12, 2002 and orders were

---

[10] Hirsch Decl. (DI 77), Ex. G, at 1-5.

[11] *Id.* at 2.

[12] *Id.*

[13] *Id.* at 3.

documented at least as recently as October 10, 2002.[14]

- Plaintiff's counsel advised Dr. Chiagouris that the billboards were located in at least 18 specified areas, the population of which, per the 2000 Census, was 12.8 million people, or 4.54 percent of the total population of the United States.[15] Dr. Chiagouris then "simply assumed" that 4.54 percent of Coors Light sales were made in these 18 areas in which the billboards were displayed.[16]

- As Coors' marginal gross profit on Coors Light, according to a document provided to Dr. Chiagouris, was $803.4 million, "[o]ne could conclude that [$36.5 million] is a reasonable number to use to calculate the impact on [Coors'] profits."[17]

- Although Dr. Chiagouris does not accept that the billboards impacted only the African American population, the African American population of the 18 specified areas was 2.1 million, or 0.76 percent of the U.S. population. Accordingly, "[o]ne could conclude that" 0.76 percent of Coors' 2002 marginal gross profit on Coors Light, or $6.1 million, "is a reasonable

---

[14] *Id.*

[15] *Id.*

[16] *Id.* at 4.

[17] *Id.*

number to use to calculate the impact on profits."[18]

- He then goes on to argue that "the entire range" of $6.1 to $36.5 million "is conservative."[19]

- Finally, he acknowledges that it might be argued that "not all of the profit can be assigned exclusively to the billboards" because "other marketing initiatives beyond the billboards also impacted profits." But he rejects any such argument because "[m]arketing programs are intended to be synergistic . . . . If one important initiative is omitted, than [*sic*], the entire program's effect is diminished. It is similar to imagining the removal of a tire from a car. The tire is but one among many components of the car, but if it is removed, the car will not go forward."[20]

With this background, I turn to plaintiff's specific arguments.

### (1) Qualifications

The issue of qualifications was litigated earlier. Plaintiff disagrees with the Court's ruling but has pointed to nothing that was overlooked. This alone suffices to deny this aspect of the motion. The Court nevertheless expands upon its previous statement.

Dr. Chiagouris, who is an associate professor of marketing at Pace University, holds

---

[18] *Id.*

[19] *Id.* at 4-5.

[20] *Id.* at 5.

a Ph.D. in the subject, and has some years of experience in the advertising business, appears to be a knowledgeable marketing person. But there is nothing in his report or his *curriculum vitae* that demonstrates that he has any expertise that would qualify him to determine in any reliable way what portion of the marginal gross profits of Coors Light in 2002 were attributable to the use of the allegedly infringing image on the billboards, even assuming that the data upon which he relied and the assumptions he made were reasonable or reliable. The fact that he may have experience in "marketing, advertising and beer campaigns," as plaintiff argues, simply does not add up to expertise relevant to determining the marginal impact on Coors Light profits in 2002 by virtue of its use of the allegedly infringing image as opposed, for example, to some other image or to an entirely different billboard.

### (2) The Data Relied Upon

Plaintiff faults the Court for concluding that the data relied upon by Dr. Chiagouris were inappropriate and especially for faulting his reliance on the 250 billboard figure. A review of the order, however, reveals that the Court did not mention any such failing. But plaintiff, having drawn the Court's attention to the point, has persuaded the Court that it should have.

Plaintiff begins by arguing that Coors used the billboards in 250 locations as evidenced by the answer to his Interrogatory No. 26.[21] According to plaintiff's memorandum, however, the interrogatory answer stated only that 250 images were produced, not that 250 in fact

---

[21] Pl. Mem. 8.

were displayed on billboards.[22] If there is evidence that 250 billboards were displayed, plaintiff has not provided it. Certainly Dr. Chiagouris' report does not indicate where this figure came from apart from attributing it to counsel. Given this record, it is impossible to conclude that the figure of 250 billboards is "based upon sufficient facts and data" or data "of a type reasonably relied upon by experts in the . . . field."[23] But that is only the start of the problems.

> Dr. Chiagouris' report states near the outset:
>
> "In order to provide as accurate assessment [*sic*] as possible, a number of documents were requested of both Coors Brewing Company and Carol H. Williams advertising [*sic*]. Specifically, in conjunction with interrogatories directed at both parties, Coors Brewing Company was asked for 29 items and Carol H. Williams was asked for 12 items. These items or documents, if made available, would have provided substantial insight into the process of assessing the impact of the advertising . . . It should be noted that most of the information requested of these two parties has not been provided by them. I will therefore proceed with my opinion *in the absence of the necessary information previously requested. In so doing, my opinion is based on the limited information that was provided to me.*"[24]

In other words, Dr. Chiagouris' opinion was rendered without the information that he regarded as necessary. I accept him at his word on the issue of necessity. But I do not accept that the lack of the necessary information justifies receipt into evidence of his best guess in its absence. Expert testimony must be reliable, which usually means that it must rest on appropriate data. The lack of appropriate data, whatever the reason, does not justify the receipt in evidence of unreliable, unsubstantiated expert testimony. To whatever extent plaintiff was dissatisfied with defendants'

---

[22] *Id.*

The parties do not appear to have supplied the Court with the actual interrogatory answers.

[23] FED. R. EVID. 702-03.

[24] Hirsch Decl. (DI 77) Ex. G, at 1-2 (emphasis added).

compliance with discovery requests, it was entitled to seek relief from the Court.

Next, it is plain from Dr. Chiagouris' report that he has no empirical basis for the assumption that the billboards each were displayed for 12 months. By his own admission, "[t]here is no standard amount of time that billboards stay up in view of the public." Yet his opinion rests heavily on the unsupported 12 month assumption.

Finally, there is absolutely no data to support the implicit assumption underlying the opinion that the impact of this advertising – which was formulated by a specialized advertising agency precisely to focus on African American consumers, although perhaps not to the entire exclusion of others – was the same on African American and all other viewers of the billboards.

### (3)    *The Reliability of the Opinion*

Even putting aside Dr. Chiagouris' lack of pertinent qualifications and the lack of reliable data undergirding his opinion, we have the opinion itself and its internal logic. Stripped to essentials, Dr. Chiagouris proposes to testify that the fraction of the total 2002 profits of Coors Light attributable to the use of the allegedly infringing image on however many billboards were displayed for however many weeks was equal to the fraction that the aggregate population of the cities in which at least one billboard was displayed was of the entire population of the United States. This simply is not reliable expert testimony, as is evident from the following hypothetical.

Suppose that one billboard bearing the allegedly infringing image was displayed for two weeks in an obscure location in Tottenville, which is at the southern tip of Staten Island, and that no others were displayed in the City of New York. The logic of Dr. Chiagouris' opinion nevertheless would lead inevitably to the conclusion that the share of Coors Light 2002 U.S. profits

of $803.4 million attributable to the alleged infringement would be same percentage of that sum as the entire population of New York City (approximately 8 million) would be to the population of the United States (281.4 million) – i.e., 2.8 percent or $22.9 million. And it does so regardless of what proportion of Coors Light sales were in New York City (or Staten Island or Tottenville), regardless of how much traffic passed that billboard, and regardless of a host of other variables that would have an important bearing.

None of this is to say that reliable expert testimony could not have been developed on precisely the point Dr. Chiagouris purports to address. For example, and without limiting the possibilities, there are means of determining the quantitative impact of billboard advertising in general and of particular billboard advertisements. Indeed, a properly designed survey of the sort that are common in trademark and trade dress infringement litigation easily could have been used to develop evidence as to whether and to what extent the allegedly infringing image, as opposed to other images or other billboards altogether, was likely to have influenced consumer behavior. Regardless of the existence of such alternatives, however, this proposed testimony does not get over the *Daubert* threshold.

C.   *The Alternative Relief*

The Court declines to resolve *in limine* plaintiff's request for a ruling that evidence of defendant Coors Brewing Company's gross receipts from the sale of Coors Light Beer in the United States in 2002 would meet plaintiff's burden of proof of damages under 17 U.S.C. § 501 [*sic*].

Plaintiff next asks that the Court take judicial notice of the total and African

American populations of 18 cities and of other unspecified demographics as reported on a Census Bureau Internet web site. In support of that application, he relies on Exhibit G to the moving affidavit, which appears to contain 44 pages of Census data. Neither the relevance of nor the need for *all* of this data is clear, and plaintiff has made no effort to explain it. Nor, for that matter, has plaintiff focused on the real issue, which is whether the data, even if judicially noticed, would be admissible over hearsay objection. But there is no occasion to resolve these matters now, as the Court has every reason to believe that the parties can work this out.

Finally, the Court may permit the distribution of hard copies of certain photographs to the jury, but it is impossible to determine from plaintiff's papers what he proposes to do. Accordingly, this cannot be resolved in the present context.

*Conclusion*

The motion for reconsideration and other relief (DI 89) is denied in all respects. The evidentiary matters raised in the prayer for alternative relief may be raised in a more concrete way at trial.

SO ORDERED.

Dated: November 7, 2007

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)